IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GERALD FLETCHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 3:14-cv-2375 |
| | ) JUDGE CAMPBELL |
| WEST TENNESSEE FUNERAL | ) |
| ASSOCIATES, LLC, AND FORENSIC | ) |
| MEDICAL MANAGEMENT SERVICES, | ) |
| PLC, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Pending before the Court are motions for summary judgment filed by Defendant West Tennessee Funeral Associates, LLC (Docket No. 50) and Defendant Forensic Medical Management Services ("Forensic Medical") (Docket No. 54). For the reasons set forth herein, the Court will GRANT both motions.

**I.   Factual Background and Procedural History**

On December 19, 2014, Plaintiff Gerald Fletcher filed this diversity action raising claims against Forensic Medical Management Services ("Forensic Medical"), a private company operating under contract to serve as the medical examiner for Davidson County, Tennessee, and West Tennessee Funeral Associates, LLC ("Funeral Associates") for their respective failures to notify him of the murder of his daughter, Kerry Fletcher, in 2002, so that he could make decisions about the disposition of her body. Mr. Fletcher amended his complaint on February 3, 2015. Each Defendant seeks judgment on all claims against it.

Kerry Fletcher was adopted as an infant by the Plaintiff, Gerald Fletcher, and his former

wife.[1] Upon her parents' divorce, Kerry lived with her mother, where she was sexually abused by her mother and her mother's boyfriend. As a result of this abuse, Mr. Fletcher was awarded sole custody of Kerry. When Kerry was seven years old, her father married Tamara Fletcher, and the two have six biological children. During the time that the family was living in Florida, when she was between the ages of seven and fourteen, Kerry was institutionalized two or three times for psychiatric care, as she was exhibiting emotional and behavioral problems. At some point, Kerry and her family moved to California.

In 2000, when Kerry was nineteen years old, her father gave her an ultimatum to either stop bringing drugs and men into the home or move out. Kerry Fletcher chose to leave home rather than comply with her father's rules. The day after Mr. Fletcher issued his ultimatum, Kerry's step-mother drove her to a homeless shelter in Corona, California. After her step-mother reiterated the family's expectations for her behavior, Kerry "got out and said, I don't want to be here. I don't want to be with you. I want to go out there." Docket No. 54-5 at 77 (Tarama Fletcher Dep. 76:14–15). Although Mr. Fletcher saw his daughter two or three times out in the community, she was unwilling to tell him where she was living. Mr. Fletcher attempted to learn where Kerry was living from her friends and children in the neighborhood. The last time Mr. Fletcher saw Kerry was at a shopping center in 2000. Approximately one year after Kerry left her father's home, Mr. Fletcher moved back to Florida with his wife and other children. Mr. Fletcher did not know where Kerry lived at the time, and there appears to be no evidence in the record that Kerry Fletcher was aware that her father, step-mother, and half-siblings were moving.

During her time living in a homeless shelter, Kerry met and became romantically involved

---

[1] Kerry Fletcher will be referred to as Kerry or Kerry Fletcher rather than "Ms. Fletcher," to avoid confusion with her step-mother, Tamara Fletcher.

with a man named Edward Olson. Kerry was pregnant with the child of another man, one whom she would only identify as the leader of a gang known as the Bloods. Kerry told friends she was extremely afraid of the child's father. On February 6, 2001, Kerry gave birth to a child named Haley Fletcher. Kerry did not notify her father of her pregnancy or the birth of her child. A few months after Haley was born, Kerry and Edward Olson, who were engaged to be married, moved to Tennessee to be closer to Mr. Olson's family. Kerry and Mr. Olson's mother, Linda Atchley, had a special connection. Kerry lived with Mr. Olson's sister at first, but in December, 2001, she moved in with Ms. Atchley in Camden, Tennessee. Kerry was afraid for her own and her baby's safety because she often received threats from the baby's father. Docket No. 54-6 at 28 (Atchley Dep.). Because of these threats, Kerry asked Ms. Atchley to take custody of Haley. The court documents filled out by Kerry in the custody matter identified Ms. Atchley as the maternal grandmother of Haley. On January 31, 2002, a juvenile court judge in Benton County, Tennessee granted Ms. Atchley custody of Haley Fletcher.

In March 2002, over a year after she moved in with Ms. Atchley, Kerry and Mr. Olson moved to Nashville to try to find jobs. Approximately three weeks later, on March 18, 2002, Kerry was found dead under a bridge in Nashville, Tennessee, having been strangled. On that day, detectives came to Ms. Atchley's home and requested a photograph of Kerry, and then informed Ms. Atchley of Kerry's murder. Ms. Atchley gave the detectives a phone number for Mr. Fletcher, which Mr. Fletcher contends was an incorrect number. A homeless man was later convicted of Kerry's murder.

Forensic Medical Management Services, the medical examiner for Davidson County, received Kerry's body on March 18, 2002. Sherrie Saint served as a death investigator for Forensic

Medical, and her job responsibilities included notifying a decedent's next of kin that the individual's body was at the office and would be undergoing an examination. Ms. Saint immediately attempted to contact the Plaintiff using a contact number she had in her file. She testified in her deposition, thirteen years after the events at issue, that she did not recall who provided the telephone number to her. Ms. Saint further testified that, upon placing the call to the number in the file, someone who identified herself as Tamara Fletcher answered the telephone and stated that she did not know Kerry Fletcher and that she had no children. Gerald and Tamara Fletcher both deny receiving a phone call from Ms. Saint and state that the phone number Ms. Saint called never belonged to either of them. Ms. Saint had been told by several individuals that the Fletchers had thrown Kerry out of their home and would likely claim that they did not have any children, so this response was not unexpected to her. She made notes about the conversation in the file. Mr. Fletcher does not dispute that Ms. Saint made the call that she documented on March 18, 2002. Docket No. 60 at 18. Dr. Feng Li performed the autopsy of Kerry the same day as the body was brought in. Dr. Li was, at the time of Kerry's autopsy, the assistant medical examiner for Davidson County, Tennessee. He is currently the Chief Medical Examiner for the county. Docket No. 58 at 6.

Following the conversation Ms. Saint had with the person she believed to be Tamara Fletcher, Ms. Saint contacted the then-chief medical examiner for Davidson County, Tennessee—Dr. Bruce Levy—and advised him of the substance of the conversation. Dr. Levy authorized Forensic Medical to release Kerry's body to Ms. Atchley if and when Ms. Atchley provided the appropriate paperwork to show that she had been awarded custody of Haley Fletcher. Forensic Medical completed a form entitled "Statement of Authority to Remove from the Forensic Center the Body of Kerry Fletcher," including the representation that removal of the body was

4

"authorized by: Linda Atchley," based on its determination that Linda Atchley had the authority to contract with a funeral home for the burial of Kerry's body.

On March 21, 2002, at Ms. Atchley's request, Forensic Medical released Kerry's body to West Tennessee Funeral Associates, where Ms. Atchley had already made contact with Timothy Plunk, the funeral director. At his deposition, which was over thirteen years after his involvement with the burial of Kerry, Mr. Plunk testified that he had independent recollection of some of the events concerning the arrangements that were made for Kerry Fletcher's burial. Docket No. 53-5 at 18 (Plunk Dep. 18:10–14). Mr. Plunk testified as follows:

> A. I remember getting a call from Ms. Linda Atchley—I have taken care of some of her family and friends in the past—that this lady had been murdered in Nashville and that her parents didn't want anything to do with her. I just didn't take her word at that. We also had a phone number that we either had obtained from the Medical Examiner's Office or from her and they were contacted and they declined the body, they wanted nothing to do with any of the funeral arrangements.
>
> Q. Okay
>
> A. So then we let Ms. Linda take care of the arrangements.
>
> Q. All right. Did you contact the parents yourself?
>
> A. Yes, Sir, I'm 99.9 percent sure I took care of that myself.
>
> Q. All right. It's a pretty unusual situation for a parent to refuse to have anything to do with the burial of a child, isn't it?
>
> A. It's not very common, it's not very common but it happens.
>
> Q. Okay. And when it does happen, it usually sticks in your mind, doesn't it?
>
> A. There's some things you don't forget as a funeral director. you don't forget tragic cases. . . .

Plunk Dep. 18:19–19:17. Mr. Plunk later clarified that he had obtained the number from the medical examiner first, and later possibly also obtained the number from Ms. Atchley. Plunk Dep. 39:15–1;

39:19–40:2. The number Mr. Plunk testified that he had called to reach Kerry's family is the same number that Ms. Saint's notes listed. Ms. Atchley testified that she provided the Mr. Fletcher's telephone number to both Ms. Saint and to Mr. Plunk. Mr. Fletcher testified that the number identified by both Defendants as the one used to reach Kerry's family had never been a number assigned to anyone in the family. Mr. Fletcher not only disputes receiving the call from Mr. Plunk, but also disputes that Mr. Plunk made the call at all, apparently because there are no notes of the call in the file of the funeral home and because "the medical examiner is the entity that normally notifies the next of kin." Docket No. 58 at 5.

Mr. Plunk worked solely with Linda Atchley to make arrangements for Kerry's funeral service and burial. Ms. Atchley paid for Kerry's funeral. She testified that she still has "quite a bit on my credit card for it." Docket No. 54-6 at 41 (Atchley Dep. 40:16–17). Several newspaper articles ran in local papers soliciting funds to help cover the expense of Kerry's funeral. Some individuals and businesses in the Camden, Tennessee community made donations, and Ms. Atchley received some assistance from Tennessee's fund for victims of violence. Mr. Plunk donated his own time.

Mr. Fletcher testified that he had spent years searching the internet to find Kerry, and in December 2013 found a picture of her tombstone on the internet. He alleges that the failure of the Defendants to notify him of his daughter's death has caused him severe emotional distress.

Mr. Fletcher's Amended Complaint asserts the following claims: (1) violation of Tennessee Code Annotated § 38-7-106 by Forensic Medical, acting as medical examiner, for failing to notify and serve process on him as next of kin about the impending autopsy; (2) interference with the right of burial by Funeral Associates, who obtained Kerry's body from the medical examiner without his

6

permission as her next of kin, by misrepresenting that it had legally contracted with the proper person to assume custody of Kerry's body for purposes of removal and burial; (3): negligent infliction of emotional distress by both Defendants for failing to provide Mr. Fletcher with notice of his daughter's death and burial; (4) intentional infliction of emotional distress by both Defendants. Docket No. 19. Mr. Fletcher seeks $2.5 million in compensatory damages and $2.5 million in punitive damages and costs.

## II. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Pennington v. State Farm Mut. Automobile Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating 'an absence of evidence to support the nonmoving party's case.'" *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the moving party is able to meet this initial burden, the non-moving party must then "set forth the specific facts showing that there is a genuine issue for trial." *Id.* (quoting Fed. R. Civ. P. 56(e)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Van Gorder v. Grand Trunk W.R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the

7

truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to defeat summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. *Rodgers*, 344 F.3d at 595 (quoting *Anderson*, 477 U.S. at 252). "As to materiality, the substantive law will identify which facts are material. Only disputes over fact that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## III. Legal Analysis

As an initial matter, both Defendants argue that Mr. Fletcher's claims are barred by the one-year statute of limitations period that applies to each claim.[2] Mr. Fletcher counters that, under Tennessee law, "[t]he discovery rule prevents the running of the limitations period whenever, and for whatever reason, the plaintiff could not have reasonably known he was injured." *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 146 (Tenn. 2001); *accord Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998) (explaining statutory and case law history of the "so-called discovery rule").

Defendants respond that, even under Tennessee's discovery rule, "a cause of action accrues when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998) (citation omitted). According

---

[2]Tenn. Code Ann. § 28-3-104(a)(1)(A) (providing one-year statute of limitations for "injuries to the person"); *Steinbrunner v. Turner Funeral Home, Inc.*, No. E2001-00014-COA-R3-CV, 2002 WL 14088, at *3 (Tenn. Ct. App. Jan. 2, 2002) (holding that Tenn Code. Ann. § 28-3-104(a)(1) applies to claims for mental injury caused by interference with burial rights).

8

to Defendant Forensic Medical, no reasonable juror could conclude that the Plaintiff did not have actual notice of his cause of action by March or April, 2002, over twelve years before this suit was filed. Docket No. 55 at 18. The Court disagrees. Mr. Fletcher denies having actual notice of his daughter's death and the arrangements made for her burial, and that factual dispute can only be resolved by a jury.

Defendant Forensic Medical alternatively argues that Mr. Fletcher does not satisfy the discovery rule because Forensic Medical's autopsy report was a public record that could have been discovered through due diligence. Docket No. 66 at 5. Under Tennessee law, "the plaintiff is deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct." *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn. 1994). Mr. Fletcher only knew that he could not locate his adult daughter who, last he knew, was homeless and making what most parents would consider bad decisions. These facts are not sufficient to put a reasonable person on notice that he should search the public autopsy records in a state where he had never known his daughter to live, much less that he might have suffered an injury as a result of allegedly wrongful conduct by a medical examiner and funeral home. Mr. Fletcher's action is not barred by the statute of limitations.

### A. Claim Against Defendant Forensic Medical Under Tennessee Code Annotated § 38-7-106

Plaintiff alleges that Forensic Medical had a statutory duty to notify him, as the next of kin, of the pending autopsy of Kerry Fletcher under Tennessee Code Annotated § 38-7-106, which is a provision of the Tennessee Post-Mortem Examination Act. With respect to the authority to conduct an autopsy and the duty to notify the next of kin, the Act provides as follows:

A county medical examiner may perform or order an autopsy on the body of any

9

person in a case involving a homicide, suspected homicide, a suicide, a violent, unnatural or suspicious death, an unexpected apparent natural death in an adult, sudden unexpected infant and child deaths, deaths believed to represent a threat to public health or safety, and executed prisoners. When the county medical examiner decides to order an autopsy, the county medical examiner shall notify the district attorney general and the chief medical examiner. The chief medical examiner or the district attorney general may order an autopsy in such cases on the body of a person in the absence of the county medical examiner or if the county medical examiner has not ordered an autopsy. The district attorney general may order an autopsy in such cases on the body of a person in the absence of the county medical examiner or the failure of the county medical examiner to act. *The authority ordering the autopsy shall notify the next of kin about the impending autopsy if the next of kin is known or reasonably ascertainable.* The sheriff or other law enforcement agency of the jurisdiction shall serve process containing such notice and return such process within twenty-four (24) hours.

Tenn. Code Ann. § 38-7-106(a) (emphasis added). The statute further provides that, "[a] person who in good faith performs a medical examination or an autopsy under this part is immune from civil or criminal liability in performing the authorized service." Tenn. Code Ann. § 38-7-112.

The Tennessee Supreme Court has held that "good faith is best understood as the absence of bad faith," *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 674 (Tenn. 2013) (citation omitted), and has defined "bad faith" as follows:

> "[B]ad faith" is not simply bad judgment or negligence. It involves a dishonest purpose. In general, bad faith implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.

*Id.* at 675 (internal citations and punctuation omitted).

No reasonable jury could conclude that Forensic Medical did not act in good faith. Ms. Saint had been given a phone number to reach Kerry Fletcher's parents and had been told that Kerry was estranged from her parents and that they would likely deny any relationship to her. Ms. Saint called the number she had been given and spoke with a woman who first identified herself as Tamara

10

Fletcher but then denied a relationship with Kerry. Ms. Saint contacted Dr. Levy to ask for guidance as to whom the medical examiner should release Kerry's body after the autopsy was completed. Having been told that the decedent's parents had refused to acknowledge their daughter, which was not inconsistent with what staff had been told to expect, and that Ms. Atchley had custody of Kerry's only child, Mr. Levy determined that Forensic Medical could release Kerry's body to Ms. Atchley, as the person acting on behalf of the minor next of kin (Haley Fletcher). Mr. Fletcher disputes that Tamara Fletcher was the individual on the other end of Ms. Saint's call, but does not dispute that Ms. Saint made a telephone call to the number she had been provided and had the conversation she described.

Mr. Fletcher takes issue with the medical examiner's decision to treat Haley Fletcher as Kerry's next of kin. He cites a Tennessee Supreme Court case that provides the order of priority for the right to dispose of a dead body, which does not include a minor child. Docket No. 59 at 5 (citing *Seals v. H & F, Inc.*, 301 S.W.3d 237, 246 (Tenn. 2010)). Mr. Fletcher also points to the holding in *Seals* that, because "a minor child is not among those who will ordinarily be empowered to direct the disposal of a body," "it may be reckless" for a crematory facility operator "to follow the child heir's instructions, because the operator may not consciously disregard the rights of the individual actually empowered to make the decision." *Seals*, 301 S.W.3d at 247. In *Seals*, the decedent's mother had filed a diversity-of-citizenship suit in federal court against a funeral home and crematory operator, alleging wrongful cremation and seeking tort damages. The Honorable William J. Haynes, Jr. of this Court certified questions of state law to the Tennessee Supreme Court. Thus, the principles of law for which Mr. Fletcher cites *Seals* were sufficiently unclear to this Court that it sought guidance from the state Supreme Court, which rendered it's decision in 2010, eight years after

11

Forensic Medical was faced with a decision about what to do with Kerry Fletcher's body upon completion of the autopsy.

It is clear from the *Seals* decision that the issues presented in that case were ones of first impression, as there was no clear authority on the issue of who has a right to make decisions about disposal of a body and how to order the priority of those who might want to claim the right to make such a decision. *See id.* at 246 ("Until our General Assembly provides more explicit guidance on the subject, we adopt the following order of priority as to the right to dispose of a dead body. . . .") Furthermore, the *Seals* court lists "an adult who exhibited special care and concern for the decedent" as an individual who has a right to dispose of a dead body, assuming someone with higher priority is not available. *Id.* Given that Forensic Medical had made efforts to ascertain the wishes of Kerry Fletcher's parents to no avail and that no other individual was claiming to have a right to decide how to dispose of her body, it was reasonable for Forensic Medical to release the body to Ms. Atchley, who clearly had a special relationship with Kerry, as demonstrated by the fact that Kerry had given Ms. Atchley custody of her minor child.

Forensic Medical's efforts to notify Kerry Fletcher's next of kin were undertaken as part of its responsibilities as medical examiner, were made in good faith, and as a result, Forensic Medical is entitled to immunity pursuant to by § 38-7-112.[3] *See Steinbrunner v. Turner Funeral Home, Inc.*, No. E2001-00014-COA-R3-CV, 2002 WL 14088, at *1 (Tenn. Ct. App. Jan. 2, 2002) (affirming trial court's conclusion that the medical examiner "enjoys immunity" under § 38-7-112 from claims of decedent's wife). The Court will enter judgment for Forensic Medical on this claim.

### B. Claim Against Defendant Funeral Associates for Interference With the Right

---

[3]Forensic Medical does not dispute that it was the "authority ordering the autopsy," as described in § 38-7-106(a).

**of Burial**

Tennessee courts have long held that interference with the right of "the surviving husband or wife or next of kin" to control the disposition of a dead body is an actionable wrong. *Seals v. H & F, Inc.*, 301 S.W.3d 237, 243 (Tenn. 2010) (quoting *Hill v. Travelers' Ins. Co.*, 294 S.W. 1097, 1099 (Tenn. 1927)).

Funeral Associates argues that if the Court accept's Mr. Fletcher's argument that his cause of action did not accrue until December 20, 2013, the date he testified he had learned of his daughter's death after locating a photograph of her tombstone on the internet, which saves his claims from being in violation of the statute of limitations, then the Tennessee statutes that were enacted in 2012 to provide certain protections for funeral homes govern his claims and requires their dismissal as a matter of law.

Effective April 25, 2012, Tennessee Code Annotated § 62-5-707 provided the following:

> Any person signing a funeral service agreement, cremation authorization form, or any other authorization for disposition shall be deemed to warrant the truthfulness of any facts set forth therein, including the identity of the decedent whose remains are to be buried, cremated, or otherwise disposed of, and the party's authority to order such disposition. *A funeral establishment shall have the right to rely on such funeral service contract or authorization and shall have the authority to carry out the instructions of the person whom the funeral establishment reasonably believes holds the right of disposition. No funeral establishment is responsible for contacting or independently investigating the existence of any next-of-kin or relative of the decedent.*

Tenn. Code Ann. § 62-5-707 (emphasis added).

Tennessee Code Annotated § 62-5-708 further provides:

> No funeral establishment or funeral director who relies reasonably in good faith upon the instructions of a person claiming the right of disposition shall be subject to criminal or civil liability or subject to disciplinary action for carrying out the disposition of the remains in accordance with the instructions unless the funeral establishment or funeral director knew or had reason to know that the person did not

13

have the right of disposition.

Tenn. Code Ann. § 62-5-708.

The Court agrees with Funeral Associates that these Tennessee statutes govern Mr. Fletcher's claims. *See, e.g., Miller v. Cookeville Reg'l Med. Ctr.*, No. M2014-01917-COA-R3-CV, 2015 WL 5719739, at *3 (Tenn. Ct. App. Sept. 29, 2015); *Jones v. Morristown-Hamblen Hosp. Ass'n, Inc.*, 595 S.W.2d 816, 819 (Tenn. Ct. App. 1979). Accordingly, Funeral Associates had the right to rely on the instructions of Ms. Atchley, who it reasonably believed held the held the right of disposition of Kerry's body. Pursuant to the clear language of the statute, Funeral Associates was not responsible for contacting or independently investigating the existence of any next-of-kin or relative of Kerry's. There is no evidence in the record that would support a jury finding that Funeral Associates relied on Ms. Atchley's instructions in anything other than good faith. It is clear from Mr. Plunk's testimony that the funeral home did not know or have reason to know that Ms. Atchley did not have the right of disposition of Kerry's body. Accepting as true the testimony of Mr. Fletcher and his wife that they never received telephone calls notifying them of Kerry's death or burial arrangements, Mr. Fletcher has no evidence to dispute Mr. Plunk's testimony that he made a telephone call to the number he had been given and had the conversation he described with the person who answered. That is, there is no evidence to support Mr. Fletcher's theory that Mr. Plunk is lying about the telephone conversation. Mr. Plunk relied in good faith on a conversation he had with someone he believed to be Kerry's father as well as other information that had been provided to him about Mr. Fletcher's lack of involvement in Kerry's life or Ms. Atchley's special relationship that would give her authority to make arrangements for Kerry's burial. No reasonable jury could impose liability on Funeral Associates for interfering with Mr. Fletcher's burial rights. The Court

will enter judgment for Funeral Associates on this claim.

### C. Claims Against Both Defendants for Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress

Forensic Medical argues that it is immune from civil liability under Tennessee Governmental Tort Liability Act, Tennessee Code Annotated § 29-20-201(a), because, although it is a private company, it was acting under a government contract and fulfilling a government function. Although Forensic Medical misconstrues the law, it is unnecessary to address this issue because Mr. Fletcher's claims for intentional and negligent infliction of emotional distress suffer from other legal deficiencies.

Under Tennessee law, "to state a claim for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct resulted in serious mental injury to the plaintiff." *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004). In describing these elements, the Tennessee Supreme Court has

> emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress. A plaintiff must in addition show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id*. (citations and punctuation omitted).

To prevail on a claim for negligent infliction of emotional distress in Tennessee, a plaintiff must "establish the elements of a general negligence claim: (1) duty, (2) breach of duty, (3) injury or loss, (4) causation in fact, and (5) proximate causation. In addition, the plaintiff must establish the existence of a serious or severe emotional injury that is supported by expert medical or scientific evidence." *Id.* at 52.

15

Defendant Funeral Associates argues that Mr. Fletcher does not have sufficient evidence of causation to survive summary judgment, and the Court agrees. As the Tennessee Supreme Court pointed out in the context of a Tennessee statute governing medical malpractice cases, the "statute codifies the common law elements of negligence—duty, breach of duty, causation, proximate cause, and damages. No claim for negligence can succeed in the absence of any one of these elements." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993) (citations omitted). Perhaps both Defendants called the wrong telephone number. The Court accepts as true that neither Mr. Fletcher nor his wife received a telephone call from either Defendant. Nonetheless, Mr. Fletcher simply has no evidence to refute the evidence given by both Defendants as to their efforts to reach him by telephone. As to the negligent infliction of emotional distress claim, neither Defendant breached its duty of care. As to the intentional infliction of emotional distress claim, Mr. Fletcher has failed to show that either Defendant breached a duty or engaged in conduct that was intentional, reckless or so outrageous that it cannot be tolerated by civilized society. The facts in this case are tragic, but liability does not rest with either of these Defendants.

## IV. Conclusion

For the foregoing reasons, the Court will grant the motions for summary judgment filed by Defendant West Tennessee Funeral Associates, LLC (Docket No. 50) and Defendant Forensic Medical Management Services ("Forensic Medical") (Docket No. 54).

An appropriate order is filed herewith.

*[signature: Todd Campbell]*

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE